UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____ )
UNITED STATES OF AMERICA,         )
                                  )
                                  )    5:17-CR-00142-D-1
          vs.                     )
                                  )
KEITH LAMONT TUTT,                )
          Defendant.              )
_____)

OCTOBER 12, 2017
SENTENCING HEARING
BEFORE THE HONORABLE JAMES C. DEVER III
CHIEF UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

<u>On Behalf of the Government</u>:

LESLIE K. COOLEY, ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
310 New Bern Avenue, Suite 800
Raleigh, North Carolina  27601

<u>On Behalf of the Defendant</u>:

JAMIE L. VAVONESE
Vavonese Law Firm, P.C.
421 Fayetteville Street, Suite 1100
Raleigh, North Carolina  27601

AMY M. CONDON, CRR, CSR, RPR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

```
 1         (Thursday, October 12, 2017, commencing at 1:00 p.m.)

 2                      P R O C E E D I N G S

 3         THE COURT:  Good afternoon and welcome to the United

 4  States District Court for the Eastern District of North

 5  Carolina.

 6         The first matter we'll take up is the sentencing of

 7  Keith Tutt.

 8         Good afternoon, Ms. Vavonese, are you and Mr. Tutt

 9  ready to proceed?

10         MS. VAVONESE:  Your Honor, at this point Mr. Tutt

11  would like to be heard on withdrawing his plea.

12         THE COURT:  Okay.  At this time I ask that the

13  defendant be sworn.

14      (The defendant, Keith Lamont Tutt, was duly sworn.)

15         THE COURT:  Mr. Tutt, do you understand that, having

16  been sworn, your answers to my questions are subject to penalty

17  of perjury and if you were to lie to me you could be prosecuted

18  for perjury or for making a false statement?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Have you taken any kind of medicine or

21  any other substance in the last 48 hours that would affect your

22  ability to hear and understand these proceedings?

23         THE DEFENDANT:  No, sir.

24         THE COURT:  Do you know why you're here today?

25         THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  Ms. Vavonese, do you have any reason to

2   doubt Mr. Tutt's competence to go forward here today?

3          MS. VAVONESE:  I don't, Your Honor.

4          THE COURT:  Did the Government have any reason to

5   doubt his competence to go forward today?

6          MS. COOLEY:  No, Your Honor.

7          THE COURT:  Mr. Tutt, your counsel indicated that you

8   want to be heard on withdrawing your plea of guilty.  You

9   entered a plea of guilty in this Court to two charges:

10  Conspiracy to distribute and possess with intent to distribute

11  5 kilograms or more of cocaine, and possession of a firearm in

12  furtherance of a drug trafficking crime.

13          What do you want to say?  You did that pursuant to a

14  plea agreement that you signed.

15          THE DEFENDANT:  Yes, sir.  I was trying to see if I

16  would be able to withdraw my plea.

17          THE COURT:  On what basis?

18          THE DEFENDANT:  Because I just feel like there were

19  certain things that I wasn't informed by my counsel.

20          THE COURT:  Anything else you want to tell me?

21          THE DEFENDANT:  No, sir.

22          THE COURT:  All right.

23          Ms. Cooley, do you want to be heard?

24          MS. COOLEY:  Your Honor, Mr. Tutt did sign the plea

25  agreement.  I think that Your Honor's talking with him at the

arrangement was more than thorough in letting him know that this was a final decision at that point in time.  We have no reason to believe that Ms. Vavonese withheld any of the evidence from Mr. Tutt and that all offers have been conveyed to him and we would ask that it please stand.

THE COURT:  Do you want to say anything in response, Mr. Tutt?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  The Court is to consider a multitude of factors in connection with a motion to withdraw a guilty plea.  These factors are outlined in a number of cases from the Fourth Circuit, including *United States v. Moore*, 931 F.2d. 245, 248 (4th Cir. 1991).

The Court is to consider, one, whether the defendant provided credible evidence that his plea was not knowing or voluntary; two, whether the defendant credibly asserted his legal innocence; three, whether there was a delay between entering the plea and moving for withdrawal; four, whether the defendant had close assistance of competent counsel; five, whether the withdrawal will prejudice the Government; and six, whether the withdrawal will inconvenience the Court and waste judicial resources.

In this case, the Court finds that the defendant has provided no evidence that his plea was not knowing or voluntary.  The Court conducted a very thorough Rule 11

colloquy.  The defendant was under oath during that colloquy.
The Court explored at length all the rights that he has under
the Constitution and laws of the United States.  The Court
explained the charges against him, the potential penalties he
faced, the rights he would be giving up if he decided to plead
guilty.  The Court also thoroughly examined and discussed with
him the plea agreement that he had entered.

At the conclusion of that process, which the Supreme
Court has repeatedly declared to be a solemn process undertaken
in open court, the defendant entered a knowing and voluntary
plea.  The Court made findings to that effect on the date of
the plea.

The second factor is whether the defendant credibly
asserted his legal innocence.  The answer to that is no.

The third factor is whether there was a delay between
entering the plea and moving for withdrawal.  The defendant's
plea was entered some time ago.  He moved to withdraw here on
the date of his sentencing.  There was a delay in him doing
this.

The fourth factor is whether the defendant had close
assistance of competent counsel.  Ms. Vavonese is excellent
counsel, appears here regularly.  The Court finds that he did
have the close assistance of competent counsel.

Five, whether the withdrawal will prejudice the
Government.  The Court finds the that the withdrawal will

1    prejudice the Government.

2          The sixth factor is whether the withdrawal will

3    inconvenience the Court and waste judicial resources.  The

4    Court has already conducted an extensive colloquy as part of

5    the Rule 11 process.  The Court also has prepared for

6    sentencing.  We're here on the day of sentencing and Mr. Tutt

7    has made this motion, the motion lacks merit and the motion to

8    withdraw the guilty plea is denied.

9          Anything else, Ms. Vavonese, before we proceed to

10   sentencing?

11         MS. VAVONESE:  If you'll give me one second, Your

12   Honor.

13         I think we're ready to proceed, Your Honor.

14         THE COURT:  Is the Government ready?

15         MS. COOLEY:  Yes, Your Honor.

16         THE COURT:  The defendant has been sworn.

17         And the Court advises you, Mr. Tutt, that we're here

18   today, you have entered a plea of guilty to two charges:  The

19   first charge is conspiracy to distribute and possess with

20   intent to distribute 5 kilograms or more of cocaine.  The

21   second charge is possession of a firearm in furtherance of a

22   drug trafficking offense.  You entered a plea of guilty to

23   those charges pursuant to a plea agreement.

24         In light of some cases from the Supreme Court of the

25   United States, including the Booker, Rita, Gall, Kimbrough,

Spears and Nelson cases, the sentencing guidelines are no
longer mandatory; they're advisory.

Nevertheless, in accordance with those cases and
numerous cases from the Fourth Circuit, including the Carter,
Pauley, and Evans cases, the Court is still to take into
account the now-advisory guidelines.

The Court does this initially by making findings of
fact, including issues associated with determining an advisory
guideline range.  The Court will then consider any motion that
might be made that might move that range either up or down.
I'll then consider all arguments your lawyer makes on your
behalf, any statement you'd like to make, and all arguments of
the Assistant United States Attorney.  I'll then determine your
sentence and announce it here in open court.

Ms. Vavonese, did you receive a copy of the
presentence report?

MS. VAVONESE:  I did, Your Honor.

THE COURT:  Mr. Tutt, did you receive a copy of that
report?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have you talked with your lawyer about
that report?

THE DEFENDANT:  Yes, sir.

THE COURT:  At this time, the Court directs that the
presentence report be placed in the record under seal.

1    In accordance with Rule 32 of the Federal Rules of

2  Criminal Procedure, the Court accepts as accurate the

3  presentence report, except as to matters in dispute as set

4  forth in the addendum.

5    The addendum does contain two objections.  The

6  objections do not appear to affect the -- excuse me.  Has three

7  objections.

8    Does the defendant want to be heard on those?  The

9  first one has to do with his name and date of birth and Social

10 Security number and any other aliases.  He denies having any

11 other aliases.  Probation responded that the information is

12 from a NCIC database including a street name of Chief.

13   MS. VAVONESE:  Your Honor, we would like to be heard

14 on Objections 2 and 3.

15   THE COURT:  So Number 1 is withdrawn?

16   MS. VAVONESE:  That's correct, Your Honor.

17   THE COURT:  I'll hear you on Number 2.

18   Mr. Tutt, you may have a seat while we take these

19 objections up.

20   I'll also alert counsel that acceptance of

21 responsibility is now at issue in light of the motion that was

22 made to begin this hearing.

23   MS. VAVONESE:  Okay, Your Honor.

24   Mr. Tutt disputes that he was discussing on the

25 wiretap that he was a member of a drug trafficking organization

 1   and that Maurio Mitchell provided him instructions on how to

 2   operate that drug trafficking organization in his absence.

 3           He does not deny that he had conversations with

 4   Mr. Mitchell, but denies the substance of those.

 5           THE COURT:  But he admits conspiring with him as part

 6   of the distribution of the cocaine but just not while he was in

 7   jail, is that what the contention is?

 8           MS. VAVONESE:  I think, Your Honor, that the

 9   contention is specifically that what is alleged to have been

10   said on the wiretaps is what Mr. Tutt disputes.

11           THE COURT:  All right.

12           Ms. Cooley, do you want to say anything in response?

13           MS. COOLEY:  Your Honor, with respect to that, I do

14   have a line sheet to hand up to the Court that is one

15   conversation between Mr. Tutt and Mr. Mitchell.

16           THE COURT:  Okay.

17           MS. COOLEY:  It's marked as Government's Exhibit 1

18   for sentencing.  It's just an example of -- although Mr. Tutt

19   was not captured many times on the wiretap with Mr. Mitchell,

20   he was captured at least this time and several other times, and

21   this is a conversation, the Government would contend based upon

22   the agent's training and experience, between Mr. Mitchell and

23   Mr. Tutt during which they are discussing an incoming shipment

24   of cocaine.  So that would be one example of the conversation

25   between Mr. Mitchell and Mr. Tutt.

1    However, Your Honor, they were the type of friends or

2    associates, rather, that would go to FaceTime, as Your Honor

3    heard in the trial of Sandy Darnell Ledbetter.  That was often

4    something Mr. Mitchell employed, he would take people to

5    FaceTime.  And there was a large amount of information that we

6    missed on the wire because of the use of FaceTime.  And

7    Mr. Tutt was certainly close enough with Mr. Mitchell that they

8    would employ that method of communication, not just on the wire

9    itself.

10    So that in front of you, Your Honor, is one example

11    of that communication between the defendant and Mr. Tutt.

12    Additionally --

13    THE COURT:  That goes to the issue of where the

14    probation officer responds in March 2016, the FBI conducted

15    wiretaps on Mitchell's phones during which time Tutt was

16    overheard receiving instructions from Mitchell to conduct drug

17    transactions.  You say Government Exhibit 1 is evidence of

18    that?

19    MS. COOLEY:  I would, yes, Your Honor.

20    We also have Agent Thomas here to put him on the

21    stand if need be.

22    I would also proffer to the Court regarding the jail

23    calls that there were jail calls, several, in fact, between

24    Mr. Mitchell and Mr. Tutt after Mr. Mitchell was arrested.

25    There was a lag time between when Mr. Mitchell was arrested and

11

when several of the other associates who ultimately in the indictment were arrested.  And during that time, he had several conversations with individuals over the jail phones.

One conversation in particular that he had with Mr. Tutt was a conversation during which he tells Mr. Tutt that Unk (phonetic) and the old lady has to see Mr. Mitchell in the jail first so then he can send them to meet with Mr. Tutt.  And based on the agent's training and experience we believe that to mean there are going to be instructions given to Mr. Tutt via these two individuals who were coming to visit with Mr. Mitchell.

Further, Your Honor, on another jail call Mr. Mitchell says to Mr. Tutt, You need to make C your new mechanic.  And C is Carl Harris.  Referring to being your new mechanic is essentially the right-hand man at Elite Auto, the front business that Mr. Tutt was conducting this drug trafficking business on behalf of Mr. Mitchell out of.  Making him his new mechanic means that Carl Harris needs to be the new right-hand man.

When Maurio Mitchell was arrested, Carl Harris was in the car with him and Carl Harris was known to be Mitchell's right-hand man for a long period of time.  And once Mitchell is arrested he is essentially giving Carl Harris to Tutt instead of Mike J., who apparently could not be trusted any longer. Those were individuals known to us and developed throughout the

investigation to be involved in this organization.

Further, Your Honor, the individuals that had
previously dealt with Mr. Mitchell, including some that were
included in his indictment, Rashad Jackson and Brian Scott and
others who were not, Peter Torres and Torres Scott, would go up
to Elite Auto.  After Mitchell was arrested, they would now go
to Keith Tutt at Elite Auto to further that business.

All of those things, Your Honor, the Government would
say in response to Objection 2 that Mr. Mitchell, in fact, was
passing the torch to Mr. Tutt; and based upon our
investigation, we believe that to be the case.

THE COURT:  All right.  I'll hear another objection
and then I'll let you put the agent on so we get all the
testimony from the agent at one time and then I'll make
findings on these and then we'll talk about acceptance of
responsibility.

Do you want to be heard on the third objection, Ms.
Vavonese?

MS. VAVONESE:  Yes, Your Honor.

On the third objection, our objection is there -- in
the presentence report it indicates that the shotgun that was
seized from the alleged stash house was loaded.

THE COURT:  Do you dispute that it was a stash house,
I mean, a house that is filled with cocaine and money?  What
would you call it, a residence to raise a family in?

1        MS. VAVONESE:  I don't dispute that it was a stash

2   house, Your Honor.

3        THE COURT:  Let's not call it an alleged stash house.

4   Let's be honest.

5        MS. VAVONESE:  The place where the shotgun was

6   seized, the objection is that the shotgun was loaded.

7        THE COURT:  All right.

8        The Government can call the agent to testify as to

9   Objection 2 and Objection 3.

10                      TIMOTHY THOMAS

11        having been duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13  BY MS. COOLEY:

14  Q.   Good afternoon, Investigator Thomas.

15  A.   Good afternoon.

16  Q.   By whom are you employed?

17  A.   I'm employed by the City of Durham, and I am currently a

18  Task Force Officer with the FBI in Raleigh.

19  Q.   How long have you been so employed?

20  A.   2003.

21  Q.   Before that and during this time, have you primarily been

22  investigating drug trafficking offenses and gang offenses?

23  A.   Yes, ma'am.

24  Q.   And you were the lead case agent in the case against

25  Maurio Mitchell; is that correct?

A.    Yes, one of the lead case agents.

Q.    And during our investigation in that particular case, did you come to develop evidence regarding the relationship between Maurio Mitchell and Keith Tutt?

A.    Yes, I did.

Q.    Tell us how you developed that information.

A.    Specifically, starting with the wiretaps, the wire call that's already been mentioned, based on my training and experience was indicative of a drug transaction between Mr. Mitchell -- instructing Mr. Tutt in regards to a drug transaction.

      After that we also had a cooperating witness or cooperating defendant, Mr. Kentrail Carlton, that talked about the relationship between Mr. Tutt and Mr. Mitchell.  Basically, that they had Elite Auto, that it was a front business for them.  Mr. Mitchell was more of a role of a silent partner but it was both of their businesses.

Q.    Now, to develop that point a little bit more for the record, with respect to Mr. Carlton, what was his relationship or knowledge base for Mr. Mitchell?

A.    Mr. Carlton and Mr. Mitchell were very close.  Mr. Mitchell supplied Carlton with kilograms of cocaine throughout their relationship that I believe lasted, according to Mr. Carlton off the top of my head, approximately 10 years.

Q.    And with respect to Elite Auto you said that Mr. Mitchell

1  was a silent partner.  Do you have any other physical evidence

2  tying him to that location?

3  A.    On the day of the search warrant of Elite Auto, Mr.

4  Mitchell's driver's license was in the desk drawer of Elite

5  Auto.

6  Q.    Now, with respect to Mr. Tutt and Mr. Mitchell and how the

7  organization was run, what information did we get from the jail

8  calls after Maurio Mitchell was arrested that indicated what

9  the relationship was there?

10 A.    Well, one jail call specifically Mr. Mitchell instructs

11 Mr. Tutt basically Mike J., who is Mike Judd, part of the

12 organization at that time, don't mess with Mike J., he's not

13 reliable, was the gist of their conversation, but deal with C,

14 which is Carl Harris, bring him on as your new mechanic.

15 Q.    And based upon your training and experience and also your

16 knowledge that developed of this organization over the course

17 of the investigation, what did you understand that to mean?

18 A.    Bring him into the organization; that he could be trusted.

19 You know, bring him on, take care of him.

20 Q.    Now, with respect to the timing of that particular

21 conversation, this is after Maurio Mitchell had been arrested

22 on our indictment, correct?

23 A.    Yes.

24 Q.    What was Carl Harris doing after Maurio Mitchell was

25 arrested?

A.   After that he also would receive instructions from
Mitchell basically cleaning up the organization.  And Carl
Harris throughout our wiretaps was -- he was always with Mr.
Mitchell, kind of a right-hand man role, spent countless hours
surveilling them together.

Q.   And on the day Mitchell was arrested, Mr. Harris was with
him?

A.   They were together.

Q.   With respect to Elite Auto, after we indicted Mitchell and
some other individuals in his organization, did we continue an
investigation into Elite Auto?

A.   Yes, we did.

Q.   What did we do?

A.   Part of that investigation involved a pole camera that was
placed on Elite Auto, the countless hours of surveillance which
we confirmed what the wire call and people were telling us that
cocaine was being distributed from there.  We saw numerous
individuals that were intercepted on our wire now begin to
frequent Elite Auto.  When we say "frequent," they were there
for two or three minutes.  Not getting a car worked on, they
would go in, go into the office and then quickly leave.

Q.   Who were some of those individuals?

A.   Specifically, Brian Scott for the month that he was still
not in custody, Carl Harris was there, but he wasn't there in a
mechanic role.  He was there for five minutes and then left.

1  Torres Scott which was intercepted on our wire, Peter Torres,

2  which was also intercepted on our wire.

3  Q.  Rashad Jackson?

4  A.  Yes.  Actually, the day before we arrested Mr. Tutt we saw

5  Mr. Jackson at the business.

6  Q.  That was after Mr. Jackson had pleaded guilty, served his

7  time and got out on our case?

8  A.  That's correct.  He was on probation.

9       MS. COOLEY:  I have no further questions with respect

10  to the relationship between Mr. Mitchell and Mr. Tutt.

11       THE COURT:  How about with respect to the gun?

12       MS. COOLEY:  Yes, Your Honor.  Thank you.

13  BY MS. COOLEY:

14  Q.  With respect to the gun that was seized, the shotgun, was

15  it loaded when we seized it from the stash house?

16  A.  No, ma'am.  The drums that serve as the magazine in this

17  gun were loaded but not inserted into the shotgun.

18  Q.  So we had the shotgun, the loaded drums and the drums fit

19  into the shotgun?

20  A.  Correct.  It's an AK-47 style shotgun so it's loaded

21  differently than what would be a traditional pump shotgun.

22       MS. COOLEY:  No further questions.

23       THE COURT:  Cross-examination?

24       MS. VAVONESE:  Yes.

25                      CROSS-EXAMINATION

BY MS. VAVONESE::

Q.    You indicated that on the jail call that Maurio Mitchell

instructed Mr. Tutt to deal with C and to bring him on as the

new mechanic.  To your knowledge, did Mr. Harris -- did

Mr. Tutt ever hire Mr. Harris or have dealings with Mr. Harris?

A.    Carl Harris?

Q.    Yes.

A.    The only indication we have was that their dealings were

drug in nature.  Basically, in our term of our surveillance we

know who worked there, there were two individuals that worked

there and at no point did we ever observe Mr. Carl Harris in a

working capacity at the auto shop.

Q.    Did you observe Mr. Harris with Mr. Tutt in other areas of

life, not at Elite Auto?

A.    No.  After the arrest of Mr. Mitchell, the place we would

see Mr. Harris was at Elite Auto.

Q.    And you indicated on the wire there were folks who you

were also investigating who regularly frequented Elite Auto,

Mr. Scott and Mr. Jackson.  Do you know that they didn't have a

legitimate business at Elite Auto?

A.    The nature of their business, the short-stay traffic of

their business indicated to us that it was not legitimate in

nature.  We did see at times, you know, they had an inspection

machine at Elite Auto but at no point were they pulling cars

into the shop or appear to be purchasing cars.  It was very

1  short, five-minute-type-stay traffic at the shop.

2  Q.   In particular, Mr. Jackson, you indicated that he was

3  there right before Mr. Tutt was arrested.

4  A.   Yes, ma'am.

5  Q.   Do you know that he wasn't there to buy a car?

6  A.   We don't know for certain what his purpose was, but I can

7  say that actually we observed what was very short-stay traffic

8  with Mr. Jackson and actually conducted a traffic stop of

9  Mr. Jackson after that fact.  That's how we know for certain it

10  was Mr. Jackson, but it was indicative of us based on my

11  training and experience to be the nature of drug transactions.

12            MS. VAVONESE:  May I have a moment, Your Honor?

13            THE COURT:  You may.

14            MS. VAVONESE:  Nothing further, Your Honor.

15            THE COURT:  Anything else, Ms. Cooley?

16            MS. COOLEY:  No, Your Honor.

17            THE COURT:  Thank you, Agent.

18            Section 3E1.1 of the guidelines states, "If a

19  defendant clearly demonstrates acceptance of responsibility for

20  his offense, decrease the offense level by two levels.

21            The application notes then note that the Court is to

22  consider a number of things in determining whether a defendant

23  has clearly demonstrated acceptance of responsibility in

24  accordance with Section 3E1.1(a).  And the Court is to

25  consider, among other things, whether the defendant truthfully

admits the conduct comprising the offenses of conviction,
doesn't falsely deny any relevant conduct for which he's
accountable.

The Court also is to take into account that entry of
a plea of guilty prior to commencing of trial combined with
truthfully admitting the conduct and truthfully admitting or
not falsely denying any additional relevant conduct, constitute
significant evidence of acceptance of responsibility.

"However, this evidence may be outweighed by conduct
of the defendant that is inconsistent with such acceptance of
responsibility.  A defendant who enters a guilty plea is not
entitled to an adjustment under this section as a matter of
right."

Note 5 states, "The sentencing Judge is in a unique
position to evaluate a defendant's acceptance of
responsibility.  For this reason, the determination of the
sentencing Judge is entitled to great deference on review."

Ms. Vavonese, Mr. Tutt, at the beginning of this
hearing after having signed a plea agreement, stood in this
court, swore under oath that he committed these crimes, started
out by saying he wanted to withdraw his guilty plea.  This is
your chance to explain to me why you think he should get
acceptance of responsibility and not have me take those three
points away and increase his guideline range.

MS. VAVONESE:  Your Honor, this is Mr. Tutt's first

experience in Federal Court.  And I understand what you are saying.  Mr. Tutt is facing a lengthy sentence and --

THE COURT:  Which we discussed at length at his Rule 11 hearing when he made a knowing and voluntary choice and admitted his guilt under oath, and then he starts this proceeding with a stunt that is fundamentally at odds with a man who has accepted responsibility for his criminal behavior.

I read the PSR, you're right, he hasn't been in Federal Court before.  This is not State Court.

Anything else?

MS. VAVONESE:  Your Honor, I just -- I would ask that you just consider the fact that Mr. Tutt has not had a lot of dealings either in State Court and certainly not in Federal Court.

As I said, he is facing a lengthy sentence and having the opportunity to sit incarcerated for this period of time and think about all of these various things and his family and so forth, he just wanted an opportunity to consider his options, I suppose.

And he is here and he is moving forward.  He understands that he is going to be sentenced, and he has signed a plea agreement, he has filed an acceptance of responsibility with Probation, he has written the Court a letter accepting responsibility as well.

These two objections were objections as to things

that he felt were not exactly as they were portrayed in the discovery.

THE COURT: Ms. Cooley, I know you have a plea agreement. You don't have to say anything if you don't want to. If you want to, you can.

I'm going to rule on all the objections and I'm going to address the topic of acceptance and ask the probation officer to tell me what the calculation is if he loses acceptance.

MS. COOLEY: I would just add briefly, Your Honor, I think as to Objections 1 and 3, I think they are probably fair game. As to objection 3, I think it was a semantic issue, which I think it was clear that the drums were loaded, the drums go into the shotgun and the shotgun itself was not loaded.

However, Objection 2 does give me pause with respect to acceptance of responsibility. I do think it's the fundamental crux of how we came upon Mr. Tutt and how we are here. And certainly, it's clear from the wire and jail calls that he and Mr. Mitchell --

THE COURT: And how you got to the stash house.

MS. COOLEY: Yes, sir.

THE COURT: That had the cocaine and the empty kilogram wrappers and the cash.

MS. COOLEY: Yes, sir.

1          THE COURT:  And the gun, and the drums.  All evidence

2   of serious drug dealing, poisoning the community for profit.

3          All right.  If he loses acceptance, he'd then be a 32

4   and a 1; is that correct, his advisory guideline range on

5   Count 1 would become --

6          THE PROBATION OFFICER:  121 to 151 months, Your

7   Honor.  The other change would be to fine range would then go

8   up from 30,000 to 10 million up to 35,000 to 10 million.

9          THE COURT:  Okay.  Thank you for that.

10         All right.  In connection with the objections, the

11  first objection has been withdrawn.

12         The second objection is overruled.  I do find -- I

13  credit the agent's testimony in Government Exhibit 1 that

14  Mr. Tutt did receive instructions from Maurio Mitchell

15  concerning the drug transactions as outlined in paragraph 6 and

16  8, both in the March 2016 wire and then additionally after

17  Mitchell's arrest and while incarcerated.  Mitchell himself is

18  an absolutely relentless drug dealer whose sentencing day is

19  coming.  So that objection is overruled.

20         Paragraph 11 is clarified that the shotgun found at

21  Tutt's stash house where law enforcement officers seized 864

22  grams of cocaine, digital scales containing cocaine and heroin

23  residue, four empty kilogram wrappers of cocaine, and a weapon,

24  as well as large quantities of packaging material and a cutting

25  agent, that the agents also had two loaded, high-capacity

1  20-round drum-style magazines that were there.  So that part is

2  sustained as clarified.

3         As for the topic of acceptance of responsibility, I

4  don't think that Mr. Tutt has accepted responsibility.  I think

5  the second objection and his request to withdraw his plea here

6  both independently reflect the fact that he has not accepted

7  responsibility.  He has not clearly demonstrated acceptance of

8  responsibility for his criminal behavior.  I've already quoted

9  the provisions in the commentary that seem to me particularly

10  relevant and so he loses acceptance of responsibility.

11         His advisory guideline range, then, as a result is

12  calculated as follows:

13         Paragraph 58 becomes zero, paragraph 59 becomes zero,

14  paragraph 60 becomes 32.  The Total Offense Level is 32,

15  Criminal History Category is 1, his Advisory Guideline Range on

16  Count 1 is 121 to 151 months.  His guideline range on Count 2

17  is 60 months consecutive.

18         Does the Government object to that advisory guideline

19  determination?

20         MS. COOLEY:  No, Your Honor.

21         THE COURT:  As a ministerial matter, Ms. Vavonese,

22  you agree that a 32 and a 1 yields an advisory guideline range

23  of 121 to 151 months on Count 1?

24         MS. VAVONESE:  I do, Your Honor.

25         THE COURT:  And Count 2 is 60 months consecutive by

statute.

Having determined the advisory guideline range -- no other objections to the report from the Government, correct?

MS. COOLEY:  Correct, Your Honor.

THE COURT:  I'll now hear first from Ms. Vavonese, I'll then hear from Mr. Tutt, if he'd like to make a statement, I'll then hear from Ms. Cooley.

Ms. Vavonese?

MS. VAVONESE:  Yes, Your Honor.

As I indicated, this is Mr. Tutt's first time in Federal Court.  He has limited history also in State Court.

I have had the opportunity to get to know Mr. Tutt over the last couple of months and I would tell you that the person that I have gotten to know is very different than the person we're hearing about here today.

Mr. Tutt was raised primarily by his grandmother.  He had a very strong and close relationship with her.  She was involved in all aspects of his upbringing.  She taught him family values and the importance of being involved.  They certainly had financial issues.  And those financial issues led to Mr. Tutt moving out on his own at a very early age, in his early teens.

Thereafter, Mr. Tutt has had five children.  Those children are an example of the type of person that Mr. Tutt is. His children -- his two oldest -- his oldest is in college.

His next oldest is headed to college this year.  His children
range from age 22 to age 10.  He has been involved on a
day-to-day basis with these children since their birth.

He has family that are here today in the courtroom.
He has done everything that he can to support those children
financially; and in my opinion more importantly, emotionally.

It is oftentimes that we are in a courtroom with
folks who do not stay in their children's lives.  And the
success that his children have had in furthering their
education as they've grown and becoming responsible citizens,
in my opinion, that is attributable in part to Mr. Tutt's
involvement in their lives.

Mr. Tutt had a very difficult time when his grandma
passed away.  And he has -- he would tell you that that had a
very big impact on his life.

He was the owner of Elite Auto.  His criminal
history, as you know, is a Criminal History Category 1.  He is
here accepting responsibility in light of what we've just gone
through, but he does understand the nature and circumstances of
why we're here and that he has made a mistake.

He understands also that he is going to, by your
judgment, lose out on lots of things with his family.  Seeing
his children graduate from college --

THE COURT:  By his conduct, just to be clear, right?
I don't schedule any appointment that takes place here.

1           MS. VAVONESE:  I understand.

2           THE COURT:  I will follow the law, but I don't

3    schedule these appointments.  I would never have met Mr. Tutt

4    if he wasn't a drug dealer.  That's why we're here, his conduct

5    and the consequences that flow from deciding affirmatively to

6    poison people, to poison communities for your own greed,

7    especially when you don't have to because he does have a

8    legitimate work history.  He didn't have to be a drug dealer.

9    He chose to be a drug dealer because he wanted the money.

10          Go ahead.

11          MS. VAVONESE:  And it isn't just that Mr. Tutt is

12   going to miss out on these experiences with his family.  More

13   importantly, his family is going to miss out on having him

14   there.  Certainly his kids didn't have anything to do with his

15   conduct and they are going to suffer not having him around for

16   an extended period of time.

17          This is a case where by statute he has a mandatory

18   minimum sentence.  We would be asking, Your Honor, to sentence

19   him at that mandatory minimum in light of his criminal history

20   and his familial circumstances and certainly understanding that

21   that is a very hefty punishment in light of his criminal

22   history.

23          His family is who is going to suffer most.  And

24   honestly, I would tell you that that is the thing that has been

25   the hardest for Mr. Tutt.  If it were just Mr. Tutt by himself,

I don't think we would have had many of the conversations that we've had thus far today. But Mr. Tutt is very concerned about his family and how his children will deal with his absence for this extended period of time.

And while we understand that this is a mandatory minimum situation, we would certainly ask that you sentence him at the mandatory minimum; that you would put in any judgment that he be somewhere close to home so that he has the ability to have visits from these children and stay a part of their lives. Mr. Tutt would also ask for any sort of drug treatment that is available to him as well as any sort of vocational training that he can get while incarcerated.

THE COURT: All right. Thank you.

At this time I'll hear from Mr. Tutt, if you'd like to make a statement, sir.

THE DEFENDANT: Yes.

First of all, I'd like to tell Your Honor that this is emotionally and spiritually getting through this situation. I want to thank my family for support. I would like you to forgive me for wasting your time, and ask the Government to forgive me and I accept full responsibilities for my actions.

THE COURT: Thank you, Mr. Tutt.

At this time I'll hear from Ms. Cooley on behalf of the United States.

MS. COOLEY: Thank you, Your Honor.

1          Considering the 3553(a) factors in this case when you
2    look at the nature and circumstances of this offense, it's an
3    extremely egregious offense.  Just looking at its face without
4    knowing about Mr. Tutt's connection with Maurio Mitchell and
5    the scope of that organization and the violence of that
6    organization, just looking at Mr. Tutt's conduct before we even
7    look at the rest of that, you look at what was taken from his
8    stash house and it was almost a kilogram of cocaine seized
9    between his car and the stash house, four empty kilogram
10   wrappers, a loaded 12-gauge -- well, the shotgun and then the
11   drum magazines, not just for hunting, but drum magazines in an
12   AK-47 style process to protect that stash, two 50-gallon drums
13   of cutting agent, which if you double that you get maybe 200
14   pounds of product, and that's probably being conservative,
15   which is a ton of product.  Three large cocaine presses, a
16   smaller heroin press, cocaine and heroin residue on packaging
17   scales, digital scale, food saver in the house.  It was clearly
18   a large-scale drug trafficking operation, stash house to Elite
19   Auto, lots of traffic in and out of Elite Auto, people picking
20   up but later distributed out to the street level.  And just
21   that on its face is egregious conduct, extremely egregious
22   conduct.
23          When you pair that with his relationship with Maurio
24   Mitchell, what we know about the long-term nature of Mitchell's
25   organization and the violent gang associations that that

organization had, and the individuals including Brian Scott,
who were enforcers and shooters for that organization, the
large amounts that were being imported by that organization
that clearly Mr. Tutt was involved with, to some extent, with
Mr. Mitchell. And then you look at Mr. Tutt's storage unit.
In the storage unit was an arsenal of assault rifles. It was
six semiautomatic rifles and one shotgun that were just located
in his storage unit. Again, that is egregious. For what
purpose could he be using those guns but to protect this drug
trafficking business?

All of this together, Your Honor, is a very, very
serious and high-level drug offense. This is not a small-level
dealer. Mr. Tutt was a large-level dealer within the City of
Durham.

Then you look at the history and characteristics of
this particular defendant and he is a Criminal History Category
1, but I would argue to the Court that that is misleading.

If you look at his prior convictions, you look at the
inhaling toxic vapors, well, that was actually pled down from a
possession with intent to sell and deliver cocaine. Then you
look at the possession with intent to manufacture, sell and
deliver a Schedule II, and that was pled down from a
trafficking Schedule II. And then you look at the possession
of marijuana, that was pled down from possession with intent to
sell and deliver all in Durham County. I don't know what was

going on with those situations but I know they were pled down

from more serious offenses to less serious offenses.  And so

here we are here with a Criminal History Category 1.

But I do think it's relevant to the history and

characteristics of this defendant.  This is not a one-off, this

is not the first time he's been involved with this.  He cannot

claim this is the first he's ever known of drug trafficking

because that's just not.  That started in 1994.  He is 40 years

old and spent his life being a drug trafficker.

With respect to the seriousness of this offense, Your

Honor, I don't think it can get much more serious short of a

murder being committed, but I think that in order to protect

the public from Mr. Tutt, in order to deter him from this

future activity, he needs to receive an extremely lengthy

sentence.

When we came in here today, Your Honor, because he

had gotten on board early, signed a plea agreement, accepted

responsibility early and pled into a 15-year mandatory minimum,

the Government was prepared to proceed on a mandatory minimum.

We came in today, Your Honor, and all of a sudden

does not associate with Maurio Mitchell anymore in the

objections of the PSR and does not take on the responsibilities

of that organization that he very clearly had.  And I think

that, Your Honor, in order to adequately account for that lack

of acceptance, I think that the Government at this point would

1  ask for a sentence toward the top of the guideline range, and

2  in addition to that the 60-month consecutive mandatory from the

3  924(c).

4          THE COURT:  Thank you.

5          Ms. Vavonese?

6          MS. VAVONESE:  Yes, Your Honor.

7          Just to point out regarding the convictions that

8  Ms. Cooley was discussing.  As you can see from the PSR, he was

9  16 and 17 at the time.  And as I explained earlier, he had just

10  moved out of his grandma's home.  That's not to say that the

11  convictions didn't happen.  Obviously, I'm equally as aware

12  that the convictions did happen, but I guess I would be telling

13  you that these convictions, they happened at a very early age

14  for him and then he had a consistent period of time where he

15  was not involved or convicted of any sort of crimes.

16          As it relates to Ms. Cooley's request to find him at

17  the top of the guideline range and then the additional 60

18  months, I would just go back, Your Honor, to the fact that this

19  is a mandatory minimum sentence.  The 15 years at minimum that

20  he would receive is by far the longest sentence that he has

21  ever served.  He is -- at this point, he has been in custody

22  for more time than he has ever been in custody before.  I have

23  no doubt that this is a huge deterrence from future criminal

24  activity.

25          As Ms. Cooley indicated, he's 40 years old at this

point.  In 15 years, he will be 55.  With vocational training
from the Bureau of Prisons and at his age at that point in
time, coming back out and committing the same variety of
offenses is just -- based on my knowledge of Mr. Tutt is just
not what I think that we could expect from him.

So I would be asking on behalf of his family and the
fact that he's going to miss some significant things with his
children, that you stay at the mandatory minimum range.

THE COURT:  Thank you.

The Court recognizes its obligation to impose a
sentence sufficient, but not greater than necessary, to comply
with the purposes set forth in the statute.

I have considered all arguments Ms. Vavonese has made
on your behalf.  I have considered your statement, sir.  I have
considered the position of the United States.  I have
considered the advisory guideline range.  I have considered the
letters that Ms. Vavonese submitted on your behalf.

Among other things, I'm to consider the nature and
circumstances of the offense, and the history and
characteristics of the defendant, the need for the sentence
imposed to reflect the seriousness of the offense, to promote
respect for the law and to provide just punishment.

The need for the sentence imposed to deter others who
might choose to engage in the criminal behavior that brings you
here; the need for the sentence imposed to protect the public

from further crime by you; the need for the sentence imposed to
provide you with needed education or vocational training,
medical care and other correctional treatment in the most
effective manner.

The statute lists numerous other factors.  I have
considered all those factors.  Although, I won't mention each
one individually.

As for the nature and circumstances of the offense,
there were two offenses to which you pleaded guilty.  The first
charge was conspiracy to distribute and possess with intent to
distribute 5 kilograms or more of cocaine.  The second was
possession of a firearm in furtherance of a drug trafficking
offense.  The conspiracy took place from in or about 2016 to on
or about March 31, 2017.  The offense conduct was serious, as
been described here and as reflected in the report.

You worked hand and glove with Maurio Mitchell, who
is a very, very, large drug dealer and very, very, dangerous
man in connection with drug trafficking operation.  You also
worked with him in using Elite Auto Mart as a front where you
also stored and sold narcotics and drug proceeds.  You
obviously came to the attention of law enforcement as a result
of wiretaps and other forms of surveillance.

There were numerous instances where surveillance was
undertaken where the conduct at the store and in and around the
store was consistent with drug trafficking.

1    The investigation did reveal that you had a stash

2 house in the form of an apartment in Raleigh on March 31st,

3 2017.  Law enforcement observed you leave Elite Auto and

4 followed you to the stash house.  After you left your

5 residence, a traffic stop was initiated and K9 unit responded,

6 positively alerted, 182 grams of cocaine were found in your

7 vehicle.  Search warrant was obtained for the stash house where

8 investigators seized 846 grams of cocaine, digital scales

9 containing cocaine and heroin residue, four empty kilogram

10 wrappers of cocaine, a shotgun and the 20-round drum magazines

11 that were loaded.  There also was packaging material for

12 cocaine and heroin presses, food saver machine and multiple

13 blenders and strainers.

14    After that, a search warrant was executed at Elite

15 Auto where investigators seized a digital scale and a cup which

16 contained cocaine residue as well as a handgun and ammunition.

17 Search of your storage unit in Durham revealed six

18 semiautomatic rifles, a shotgun, as well as assorted ammunition

19 and magazines.  All of this is evidence of large-scale drug

20 trafficking.  It is a very serious offense, as we've talked

21 about here today.

22    Drug dealers are all about money.  That's it.  It's

23 just greed.  It's greed.  It's I'll poison someone else's

24 children, I'll turn a blind eye to it, I'll destroy people one

25 life at a time, one family at a time, one parent/child

relationship at a time, one community at a time and I won't
care because I want my money. And that's what life is as a
drug dealer. And it's a plague and it's harmful.

As for your history and characteristics, one of the
terribly ridiculous things about this case is you didn't have
to be doing this. You're an intelligent man. You've worked
legitimate jobs.

I read the report, Ms. Vavonese described it, you
have five kids, range in age from 22, your oldest in college in
Greenville, to a 10 year old. And I accept what she says about
your role in their life and your relationship in their life,
but a father has one responsibility, be a good example to your
children. And you fundamentally cannot be a good example if on
the one hand you say, I'm taking care of you with this money
I'm giving you and you're getting the money by poisoning other
children, and that's what drug dealers do. I'll poison
somebody else's community, somebody else's children, somebody
else's mother, somebody else's sister, somebody else's brother
and I'll rationalize it in my mind by saying, but I'm a good
dad. That's bunk. Just not true. And no one should think for
a minute that it is. Because all those people you're
poisoning, they have a mom, and a grand mom, and a dad and a
grandfather who hoped for more than to see them ravaged by
addiction. They hoped for more than to have their grandchild
live in a community where children and parents are worried

about random gunfire because of drug dealers.

It's a very serious offense and it took place for a long period of time and you didn't have to be doing it.  Yeah, you wouldn't have had as much money.  But again, that's what the whole deal is about for the drug dealer.

As for your history and characteristics, you are a Criminal History Category 1.  I accept those charges were pled down for whatever reason so I take them as they are.  But this conspiracy took place for a long time.  It involved a large amount of narcotics.  It's a very serious offense.  This Maurio Mitchell drug trafficking organization is a plague.  It was a plague, and the community is better that it's been dismantled. Those who were involved need to be punished because there are consequences.

As I mentioned earlier, I don't schedule a single appointment that takes place here.  We wouldn't know each other except for how you chose to act.

A person reaps what he sews.  What does that mean? It means you harvest what you plant.  If you plant a series of good choices, then you have wonderful opportunities to gather with the family.  If you plant a series of bad choices, testament to your family and friends who wrote on your behalf and are here on your behalf to their character that they're here still supporting you, because what a betrayal.

See, they've been loving you and supporting you your

1   whole life.  Not because of money you got from drug dealing.

2   To their credit, they are here and I don't have any doubt

3   they'll continue to be supportive of you, but how disrespectful

4   of you towards them, to have engaged in this prolonged drug

5   conspiracy poisoning the community for money.

6           I am going to impose a sentence that incapacitates

7   you, that generally deters.  People need to know, you want to

8   get into the drug business, grow it big, how you pay around

9   here is with liberty.  And only you can say, is it worth it?

10  Is it worth poisoning people and then getting sent to prison

11  for a very long period of time?

12          Most rational people thankfully say I don't want any

13  part of that.  I don't want to poison other people.

14          Having fully considered the entire record in the

15  case, it's the judgment of the Court that the defendant, Keith

16  Lamont Tutt, is hereby committed to the custody of the Bureau

17  of Prisons to be imprisoned for a term of 132 months on Count 1

18  and 60 months consecutive on Count 2, yielding a total term of

19  192 months.

20          This sentence is the sentence that is sufficient, but

21  not greater than necessary, in light of all the 3553(a) factors

22  that I've talked about here today.

23          Upon release from imprisonment, you'll be placed on

24  supervised release for five years.  This term will consist of

25  five years on Counts 1 and 2 to run concurrently.

You'll comply with the standard conditions and the following additional conditions:

You'll participate as directed in a program approved by Probation for narcotic treatment, you'll consent to a warrantless search, you'll cooperate in the collection of DNA, you'll support your children.  You'll have a job while incarcerated.  You won't earn much money at it, but what you do earn you should and I order you to support your children.  They at least deserve that from you.  You'll pay a special assessment of $200.  I'm not going impose a fine in light of the need to pay the special assessment and to support your children.

I will recommend that you be kept separate from all your co-defendants in connection with this case.

I recommend vocational and educational opportunities. I'll recommend intensive drug treatment.

I do think I properly calculated the advisory guideline range, but I announce, pursuant to U.S. v. Gomez-Jimenez, 750 F.3d 370 (4th Cir. 2014), and U.S. v. Hargrove, 701 F.3d 156 (4th Cir. 2012), that I'd impose the same sentence as an alternative variant sentence if I have in any way miscalculated the advisory guideline range, including the decision with respect to the acceptance of responsibility.

The sentence I've imposed today is the sentence that is sufficient, but not greater than necessary, for Mr. Tutt in

1  light of all the 3553(a) factors that I talked about.

2        Mr. Tutt, you can appeal your conviction if you

3  somehow believe your guilty plea was somehow unlawful or

4  involuntarily or if there's some other fundamental defect in

5  the proceeding that was not waived by your guilty plea.  You

6  also have a statutory right to appeal your sentence under

7  certain circumstances, particularly if you think your sentence

8  is contrary to law.

9        However, you did enter into a plea agreement that

10  contains an appellate waiver.  If you believe the waiver is

11  uninforceable or inapplicable for any reason, you can present

12  that theory to the Appellate Court.

13        With few exceptions, any Notice of Appeal must be

14  filed within 14 days of the judgment being entered on the

15  docket in your case.

16        If you're unable to pay the cost of appeal, you may

17  apply for leave to appeal in forma pauperis.  If you so

18  request, the Clerk of Court will prepare and file a Notice of

19  Appeal on your behalf.

20        Ms. Vavonese, is there anything else?

21        MS. VAVONESE:  The only thing that we'd ask, Your

22  Honor, is that he be placed somewhere close to home so the

23  family can --

24        THE COURT:  BOP will have that home address but

25  because I think the need for a keep separate order BOP is going

1  to be the one that makes the specific decision about where he

2  gets designated.

3          Anything else, Ms. Cooley?

4          MS. COOLEY:  No, Your Honor.  Other than to note that

5  there's no victim in this case.

6          THE COURT:  And there was a forfeiture order and I

7  have signed that.  Forfeiture as part of the judgment in the

8  case as well.

9          That will conclude the matter involving Mr. Tutt.

10 Good luck to you, sir.

11

12          (The proceedings concluded at 2:03 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATE DISTRICT COURT

2    EASTERN DISTRICT OF NORTH CAROLINA

3

4

5    CERTIFICATE OF OFFICIAL REPORTER

6  I, Amy M. Condon, CRR, CSR, RPR, Federal Official Court

7  Reporter, in and for the United States District Court for the

8  Eastern District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that the

10 foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is in

13 conformance with the regulations of the Judicial Conference of

14 the United States.

15

16

17 Dated this 12th day of December, 2017.

18

19

20                              /s/ Amy M. Condon
                                Amy M. Condon, CRR, CSR, RPR
21                              U.S. Official Court Reporter

22

23

24

25